Robert E. Boehmer, Jr., by His Father and **Next** Friend, Robert E. Boehmer, Sr., Appellee, v. Michael Norton, Appellant.

Gen. No. 43,469.

Opinion filed February 13, 1946. Released for publication March 8, 1946.

MILLER, GORHAM, WESCOTT & ADAMS, of Chicago, for appellant; EDWARD R. ADAMS, of Chicago, of counsel.

EDWARD ARKEMA and LEO M. TARPEY, both of Chi-cago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

In a complaint filed by Robert E. Boehmer, Jr., against Michael Norton, he sought damages for injuries suffered while a passenger in an automobile owned by defendant and being driven by the latter's servant, caused by the alleged negligence and wilful and wanton misconduct of such servant. Defendant denied the material allegations of the complaint. A trial before the court and a jury resulted in a verdict finding defendant guilty and assessing plaintiff's damages at $4,000. Motions by defendant for a directed verdict, for judgment notwithstanding the verdict, and for a new trial, were overruled. On a remittitur of $1,500 the court entered judgment for $2,500, to reverse which defendant prosecutes this appeal.

Cicero avenue and Keating avenue are north and south streets, Keating avenue being one block east of Cicero avenue. North avenue and LeMoyne avenue are east and west streets, LeMoyne avenue being one block south of North avenue. These streets are in Chicago. Defendant operated an ice cream parlor at the southeast corner of North and Cicero avenues. He and his brother owned the premises one block east of that corner, located at the southwest corner of Keating and North avenues. On the rear of the latter premises there was a private garage in which defendant kept his two door 1941 Ford sedan automobile. The garage faced Keating avenue and the entrance was approximately 100 feet south of North avenue. Keating avenue, running south from North avenue, comes to a dead end and is blocked by a heavy board fence at the premises of the Pettibone Mulliken Company two blocks, or about 1,000 feet, south of North avenue.

Robert Weiser was an 18 year old boy who at times worked around the ice cream parlor. Plaintiff was in the ice cream parlor on the evening of Tuesday, February 9, 1943. He was then 16 years of age and a high school student. Defendant asked Weiser to put his car in his garage. The car was parked at the south curb of North avenue, facing east, in front of the ice cream parlor. The direct course to the garage was to drive one block east of Cicero avenue to Keating avenue, make a right turn and drive 100 feet south on Keating avenue to a space in the street in front of the garage, then make another right turn and drive the car into the garage. Weiser was not a chauffeur in general charge of the car. He had taken defendant's car to the garage a number of times.

There was evidence that defendant requested plaintiff to accompany Weiser. Plaintiff and Weiser went out to the car, where they met a boy named Eddie Juritz. The three boys were good friends and lived in the vicinity. They sat on the front seat of the car, Weiser sitting in the driver's seat, Juritz in the center and plaintiff on the right. Weiser drove one block east to Keating avenue, but instead of turning south and driving the car into the garage, he turned north on Keating avenue and drove in that direction for a distance of two blocks. He then stopped, turned the car around, and sped south on Keating avenue at about 50 miles an hour, slowing down to 25 or 30 miles an hour as he crossed North avenue. Then, instead of slowing down further and driving the car into the garage, he speeded up and drove at a high rate of speed south on Keating avenue, passed the garage, passed the next cross street, LeMoyne avenue, and on to the dead end of Keating avenue, about 1,000 feet south of North avenue and about 900 feet south of the garage, crashing into the fence at the dead end of Keating avenue, whereby plaintiff was injured. On

that evening there was a large sheet of ice at the south end of Keating avenue, commencing about 130 feet. north of the dead end of Keating avenue.

Plaintiff testified that there are stop signs requiring drivers to stop as they approach North avenue; that he warned Weiser to slow down; that after the car crossed North avenue going south it was driven at about the same speed as before crossing North avenue; that in traveling toward LeMoyne avenue the car was going around 50 miles an hour; that as the car got beyond LeMoyne avenue "he didn't seem to slow up or anything and we got about I would say about 130 feet from the fence and all of a sudden this boy in the middle hollered 'look out, there is ice;'" that Weiser put his foot on the brakes; that "it was too late then and he skidded 50, 20 feet" and that he kept on going and hit the fence. Joe Gutilla, a 15 year old boy at the time of the occurrence and an acquaintance of the boys in the car, testified that he was standing on the west sidewalk of Keating avenue between North and LeMoyne avenues, about 10 houses south of defendant's garage, when he saw defendant's car being driven south at a high rate of speed; that it was traveling between 45 and 50 miles an hour; that after it passed him, he did not pay any further attention to it; and that he heard the crash and ran down there. Robert Weiser testified that at the time he was driving south toward North avenue, after having proceeded north, he was headed for the garage; that after passing the garage and going south of LeMoyne avenue he was going down to the corner "to turn around" and to come "back to the garage." He testified further: "I had intended to turn around when I got to the end of the dead end street. Your guess is as good as mine why I was going down to that dead end. That is what I don't know. I knew I had gone by the garage. I went by LeMoyne Street. I passed a lot of driveways so that I could have turned around." Plaintiff was taken to a hos-

pital where his injuries were treated. He remained there until February 27, 1943. There is no contention that the judgment is excessive.

Defendant maintains that the car was not being driven within the scope of the driver's employment at the time of the causative conduct, that there was a deviation, and that therefore the court erred in denying his motions for a directed verdict and for judgment notwithstanding the verdict. Plaintiff replies that the evidence presented a question of fact for the determination of the jury and that the court did not err in denying defendant's motions. We have read the cases cited by the parties on the subject of deviation, as well as many other cases. The law is well stated in the following excerpt from sec. 556, vol. 35, American Jurisprudence:

"When the deviation and its purpose are not in dispute, and it appears beyond reasonable controversy that the purpose had no connection with the duties of the servant, there is no liability, and it is the duty of the court to dismiss the action or direct a verdict, or, if a verdict has been rendered in favor of the plaintiff, to set it aside on motion. On the other hand, in cases where the deviation is slight and not unusual, the court may, and often will, as a matter of law, determine that the servant was still executing his master's business. Cases falling between these extremes will be regarded as involving merely a question of fact, to be left to the jury or other trier of such questions."

The principal difficulty in determining the liability of the employer where he claims to be exempt on the ground of the employee's departure or deviation from the employer's business, or the employee's engagement upon a frolic of his own, lies in the determination of when the master's employment ended and the employee's departure or frolic began, and when that departure or frolic ended and the employee again entered upon his employer's business.

In *Riley v. Standard Oil Co. of New York,* 231 N. Y. 301, a chauffeur employed by defendant was ordered to take an autotruck and get some goods from the freight yard of a railroad. After he had gone there and had loaded the truck he discovered some waste wood, which he put on the truck. On leaving the freight yard he turned, not toward the defendant's mill, but in an opposite direction to take the wood to his sister's house. This errand served no purpose of the defendant, nor did defendant have knowledge thereof or consent to the act of the chauffeur. His course after delivering the wood and on his return to the mill took him past the entrance to the freight yard. Before he reached this point and when he had gone a short distance from his sister's house, he negligently struck the plaintiff with the truck, causing injuries for which the action was brought. The court of appeals held that the wood having been delivered, with the return journey back to the mill begun, at some point in the route the chauffeur again engaged in the defendant's business, and that point, in view of all the circumstances, had been reached when the collision occurred; hence, the judgment in favor of the defendant dismissing the complaint should be reversed and a new trial ordered. The court said (305):

"Should there be such a temporary abandonment the master again becomes liable for the servant's acts when the latter once more begins to act in his business. Such a re-entry is not effected merely by the mental attitude of the servant. There must be that attitude coupled with a reasonable connection in time and space with the work in which he should be engaged. No hard and fast rule on the subject either of space or time can be applied. It cannot be said of a servant in charge of his master's vehicle who temporarily abandons his line of travel for a purpose of his own that he again becomes a servant only when he reaches a point on his route which he necessarily would have passed had he obeyed his orders. He may choose a different

way back. Doubtless this circumstance may be considered in connection with the other facts involved. It is not controlling."

Defendant's instruction to take the car to the garage was explicit and Weiser knew where the garage was located. No reasonable explanation is offered for his failure to follow the instruction, except that he was acting solely on a frolic of his own. Had he followed defendant's instruction, Weiser would have driven the car 100 feet more than one block. At the time of the occurrence he had driven the car a distance of seven blocks, almost two of which were directly away from his proper destination. He traveled directly away from the garage after having reached it for no explainable reason. He had to drive only about 700 feet to perform his mission. At the time of the mishap he had driven about 3,400 feet, the last 900 feet of which were directly away from the objective of his mission. The path taken by Weiser, together with the speed at which he traveled, shows that his departure from his employer's business was deliberate and for a purpose of his own. In the course of the trip Weiser departed from the scope of his employment twice. If he had any intention of stopping and driving into the garage at the time he drove south across North avenue, he would not have accelerated his speed to 50 miles an hour.

Plaintiff, calling attention to the testimony of the driver that his purpose in proceeding to the dead end of the street was to turn around to go back to the garage, urges that whether he passed the garage inadvertently or deliberately, his act in so doing did not take him out of the scope of his employment for the reason that when he passed the garage he was faced with two alternatives: one, to stop the car some distance beyond the garage, place it in reverse gear and back up to the garage; or, two, proceed a relatively short distance to the dead end of the street with which he was familiar and there make a "U" turn and drive to the garage. Plaintiff asserts that it was the latter

course the driver chose. However, the driver also testified that "your guess is as good as mine, why I was going down to that dead end," and that he passed "a lot of driveways so that I could have turned around." Plaintiff testified that when the car got beyond LeMoyne avenue the driver "didn't seem to slow up or anything." As pointed out by the New York court of appeals, should there be a temporary abandonment of the employment, the master again becomes liable for the servant's acts when the latter once more begins to act in his business. The court points out, however, that such a re-entry is not effected merely by the mental attitude of the servant, but there must be that attitude coupled with a reasonable connection in time and space with the work in which he should be engaged.

While in many instances the scope of employment is a question for the jury, yet where reasonable men could not come to a conclusion from the evidence that a servant was acting within the scope of his employment, it is the duty of the court to hold that as a matter of law, he was not so acting. The undisputed evidence, leaving out the statement of the driver as to his intention, establishes that he deviated from the employer's business for a purpose of his own; that the purpose had no connection with his duties; that at the time of the occurrence the car was moving in a direction away from the garage and that he had not up to that time indicated by his conduct that the frolic had ended and that he had again entered upon his employer's business. We are satisfied that the court erred in not directing a verdict for the defendant. Therefore the judgment of the superior court of Cook County is reversed and the cause remanded with directions to enter a judgment for the defendant and against the plaintiff.

*Judgment reversed and cause remanded with directions.*

KILEY, P. J., and LEWE, J., concur.