MARJORIE PRINCE, Ex'r of the Estate of Arthur C. Prince, Deceased, Plaintiff-Appellee and Cross-Appellant, *v.* THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant-Appellant.—(MICHAEL E. McCASKY, Defendant; COUNTRY MUTUAL INSURANCE COMPANY, Intervening Appellee; ELECTRIC MUTUAL, Intervening Appellant.)

Third District    No. 78-89

Opinion filed August 27, 1979.—Rehearing denied October 29, 1979.

William J. Voelker, Jr., and James C. Kearns, both of Heyl, Royster, Voelker & Allen, of Peoria, for appellant The Atchison, Topeka and Santa Fe Railway Company.

William J. Thomas, of Henry D. Noetzel & Associates, of Peoria, for appellant Electric Mutual.

R. Gerald Barris and Patrick V. Reilly, of Sorling, Northrup, Hanna, Cullen and Cochran, of Springfield, for appellee Marjorie Prince.

Clifford E. Schneider, of Davis & Morgan, of Peoria, for appellee Country Mutual Insurance Company.

Mr. JUSTICE BARRY delivered the opinion of the court:

On the afternoon of November 12, 1975, the deceased, Arthur C. Prince, was killed when the car he was driving collided with a truck driven by defendant Michael McCasky. The plaintiff, wife of the deceased and executrix of the estate of Arthur Prince, subsequently brought a wrongful death action against McCasky and his employer, defendant Atchison, Topeka and Santa Fe Railway Co. (hereinafter referred to as Santa Fe). Plaintiff also filed a workmen's compensation claim against the decedent's employer, The General Electric Company. Prior to trial on the wrongful death action, the arbitrator awarded Mrs. Prince $267.01 per week for the rest of her life pursuant to the applicable provisions of the Workmen's Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138.7(a)). Electric Mutual, General Electric's Workmen's Compensation insurance carrier, subsequently filed a complaint for intervention claiming a lien on any judgment plaintiff would recover against defendants McCasky and Santa Fe (Ill. Rev. Stat. 1975, ch. 48, par. 138.5(b)). After a trial by jury, judgment was rendered in favor of the plaintiff against both defendants for $250,000. On motion by the plaintiff, the trial court ordered that the lien of Electric Mutual be applied to only one-third of the judgment; and not to the entire amount. Also subsequent to the judgment, McCasky's liability insurer, Country Mutual, filed a petition for leave to make a tender of $25,000 (the maximum limit of its policy coverage) to the court, along with interest and costs. The court granted the petition, and Country Mutual paid $25,000 to the clerk of the Circuit Court of Tazewell County.

Multiple issues have been raised by all parties on appeal. These issues are as follows:

A. Was defendant McCasky within the scope of employment when the accident occurred?

1. If McCasky was within the scope of his employment with Santa Fe when the accident occurred, and the judgment in favor of plaintiff Prince was proper, should the case nevertheless be remanded for a new trial because:

a. The giving of plaintiff's instructions nos. 8, 25 and 34 confused and misled the jury.

b. The court incorrectly granted defendants' motion *in limine* to preclude testimony by various individuals regarding the drinking habits of McCasky and co-employees while on the job, which would suggest

drinking on the job was within the scope of employment.

B. Should the case be remanded in any event for a new trial on the issue of damages because the damages awarded plaintiff were insufficient and contrary to the manifest weight of the evidence?

C. If the judgment in favor of the plaintiff was proper, should the lien of Electric Mutual be increased and apply to the entire judgment instead of one-third? (Our resolution of the issue will involve a determination of whether section 5(b) of the Workmen's Compensation Act is valid, given recent statutory changes which have removed the ceiling on the recovery by widowed spouses under the Act.)

D. Did the trial court incorrectly sever count III from counts I and II?

E. Did the trial court err in allowing McCasky's liability insurer, Country Mutual, to tender the policy limits to the clerk of the court subsequent to judgment against the insured?

■■ The first issue we will deal with is whether defendant McCasky was within the scope of employment when the fatal accident occurred. It is well settled that an employer is not to be held vicariously liable for injuries caused by an employee when that employee is engaged in a "frolic of his own," as he is considered at that time to be outside the scope of employment. However, once the employee departs from his frolic, and re-enters the scope of employment, injuries resulting from his negligence will result in vicarious liability on the part of the tortfeasor's employer under the doctrine of respondeat superior. The resolution of this first issue will entail an examination of the activities of McCasky and one Alvin Payton on November 12. Alvin Payton was McCasky's passenger, who was also killed in the fatal accident.

Alvin Payton was a co-employee of McCasky and lived in Lilly, Illinois. On the morning of November 12, Payton gave another Santa Fe employee, Michael McLaughlin, a ride to the Santa Fe facility in Morton, Illinois. Payton was to give McLaughlin a ride home that afternoon after work, at approximately 4.

Defendant McCasky was employed as a machine operator for Santa Fe. He had held this position for approximately 2½ years. Shortly before 7:30 on the morning of November 12, he reported to work at the Morton Depot. (Both McCasky and Payton normally worked from 7:30 until 4, with a half-hour for lunch which was usually taken four hours after work began but could be taken at any time.) After his arrival, McCasky was told by his foreman, David Cuevas, that he and Payton were to go to Pekin and repair a tamping machine. Repair of the machine involved the

removal and replacement of bolts. McCasky was instructed to drive his own vehicle, a 1974 Chevrolet truck, to Pekin. It was Santa Fe policy to reimburse its employees for transportation costs when they were required to use their own vehicles during working hours. It was understood that McCasky and Payton were to return to Morton at 4.

After arriving in Pekin, McCasky and Payton examined the tamping machine they were to repair. They then left the Santa Fe yards and purchased the necessary bolts at a nearby hardware store. On their way back to the yards, Payton suggested to McCasky that they purchase a bottle of whiskey. After purchasing the pint bottle, they worked on the machine and drank the whiskey while they worked. Payton and McCasky subsequently purchased and consumed a second bottle, and partially shared a third.

At approximately noon, the two men left the job site. Both were intoxicated at this time. McCasky testified that when he left the Pekin yard his intention was to go to Payton's house in Lilly to look at a trailer he was interested in buying. However, Mrs. Payton testified that she was at home all day and neither McCasky nor her husband came to the house. McCasky also left his tools out in the open at the Pekin yard when they left at noon. He testified that his normal practice was to lock up his tools when he was leaving a job site.

The whereabouts of McCasky and Payton from noon until 2:30 in the afternoon of November 12 are unknown, as McCasky, the sole survivor of the accident, suffers from retrograde amnesia and remembers nothing after leaving Pekin at 12. At 2:30, McCasky and Payton were seen at Charlie's Cafe in Mackinaw, a town approximately 16 miles east of Pekin on Illinois Route 9. Robert Quinton, a patron of Charlie's Cafe on that day, testified that when he saw McCasky he appeared to be intoxicated. Quinton further testified that at 2:45, Payton told McCasky that they should be leaving because "they had a rider to pick up in Morton in fifteen minutes." Kathy Friend, an employee of Charlie's Cafe, also saw McCasky and Payton, and testified that she heard Payton tell McCasky that "they were going to Morton." After Payton made the statement, he walked out the door of the cafe and was followed by McCasky. Quinton testified that he escorted McCasky to his vehicle, and told Payton that given McCasky's condition he should not be allowed to drive. Payton's response was "He drove me over, he can drive me back." Fifteen or twenty minutes later the fatal accident occurred when McCasky's vehicle, traveling on the Allentown Blacktop in a westerly direction at approximately eighty miles an hour, failed to heed the stop sign located at the blacktop's intersection with Illinois Route 121 and struck Prince's car which was southbound on Route 121. The scene of the accident is 4.4

miles south of the Santa Fe depot in Morton. From the scene of the accident the Allentown Blacktop continues west to Pekin.

After the accident McCasky no longer worked for Santa Fe. However, he subsequently submitted a time sheet claiming eight hours of work on November 12. James T. Groundwater, a Santa Fe official, testified that on behalf of Santa Fe he decided to pay McCasky until 3 p.m. on November 12. Groundwater testified that it was Santa Fe policy to pay its employees for hours claimed unless there was evidence to the contrary, and the only confirmed contrary evidence he had at the time he made his decision was that the defendant did not work after 3:00. McCasky was never reimbursed for the mileage on his car.

■ There is no question that at 2:30 on the afternoon of November 12, McCasky and Payton were on a frolic and consequently were outside the scope of their employment. The half-hour lunch which they had taken at approximately noon ended at about 12:30, and they should have returned to Pekin at that time. Whether they did or not is open to speculation, but it is uncontroverted that at 2:30 they were in Mackinaw, some miles distant south and east of Morton. Unless they were in Mackinaw on Santa Fe business, they were at this time outside the scope of their employment. The fact that they had no authority to be in Mackinaw and that there is no Santa Fe facility of any kind located there leads to the inescapable conclusion that while at Mackinaw they were on a frolic. Consequently, the issue that needs to be resolved is when, if ever, McCasky and Payton re-entered the scope of employment. The test used in determining whether an employee engaged in a frolic re-enters the scope of employment is two-pronged: First, the employee must have formulated an intent to act in furtherance of the employer's business; second, the intent must be coupled with a reasonable connection in time and space with the work in which he should be engaged. *Boehmer v. Norton* (1946), 328 Ill. App. 17, 65 N.E.2d 212; Restatement (Second) of Agency §237 (1958).

■■ Concerning ourselves first with the intention element of the re-entry test, we note at the outset that the record is devoid of any direct evidence of McCasky's intention at the time he and Payton left the cafe at Mackinaw. The only evidence introduced at the trial which has a bearing on the question of McCasky's intention is Payton's statement to McCasky at the cafe that "they had a rider to pick up in Morton in fifteen minutes," and Payton's statement to Quinton that "He drove me over, he can drive me back." The plaintiff's position is that this circumstantial evidence, when considered along with the direction McCasky's vehicle was traveling at the time of the accident, proves that McCasky was heading toward either Pekin or Morton, and thus was acting with the interest of

serving Santa Fe. The defendant Santa Fe contends that more than one reasonable inference can be drawn from this evidence, and therefore plaintiff is incorrect when she states that the only conclusion to be drawn from the circumstantial evidence is that McCasky's destination upon leaving Mackinaw was either Pekin or Morton, and therefore impliedly for some employer benefit. Defendant Santa Fe relies for support upon the following passage from *Coulson v. Discerns* (1946), 329 Ill. App. 28, 31-32, 66 N.E.2d 728, 730: "The existence of a certain fact cannot be reasonably inferred from the evidence when the existence of another fact inconsistent with the first can be inferred from the same evidence with equal certainty." (Accord, *Fabschitz v. King* (1973), 10 Ill. App. 3d 43, 293 N.E.2d 916.) In both *Coulson* and *Fabschitz* the circumstantial evidence was introduced to prove negligence on the part of the defendant, but we are of the opinion that the above-quoted language from *Coulson* is equally applicable where the fact to be proven is not negligence but rather the resumption of a master-servant relationship.

We do not believe that McCasky's destination can be reasonably inferred from Payton's statement while in Mackinaw. Payton's statement, made at 2:45, that they were going to Morton to pick up a rider in 15 minutes, is inconclusive at best because the rider, McLaughlin, was to be picked up at 4 and not 3. It is true that Payton could have been mistaken as to the time, but it is just as true that Payton could have made the statement for the purpose of convincing McCasky, who was intoxicated and causing somewhat of a disturbance at the cafe, that they had to leave. In addition, Payton's statement to Quinton that "He drove me here, he can drive me back" is equally inconclusive. Because the whereabouts of Payton and McCasky from 12 until 2:30 are unknown, the place to which Payton was referring cannot be ascertained.

The direction McCasky's vehicle was traveling at the time of the accident is not determinative of McCasky's destination either. It certainly does not support the argument posited by plaintiff that McCasky's destination was Morton, because when the accident occurred McCasky was heading west. Had McCasky been driving toward Morton he would have at the very least attempted to turn right (north) at the intersection of Allentown Road and Route 121. With regard to the plaintiff's argument that McCasky's destination was Pekin, the *only* evidence which supports this contention is the direction McCasky's vehicle was traveling when the accident occurred. An acceptance of plaintiff's argument would result in "a rule that no matter the nature of the employment or the circumstances of the deviation, the mere direction of the vehicle toward the city where the original objective was located may be considered a resumption of the employment in the employer's business. We believe that this would strain

the doctrines of agency beyond any reasonable contemplation". *Sauer v. Iskowich* (1967), 80 Ill. App. 2d 202, 209-10, 224 N.E.2d 21, 25-26.

In *Coulson*, the court stated that "[a] fact cannot be established by circumstantial evidence unless the circumstances are of a nature and so related to each other that it is the *only* conclusion that can be drawn therefrom, and mere conjecture, guess or suspicion is insufficient." (Emphasis added.) (329 Ill. App. 28, 32, 66 N.E.2d 728, 730.) We feel that from the conclusion drawn from the occurrences in Mackinaw and the direction McCasky's vehicle was traveling at the time of the accident, that McCasky's intention was to return to either Morton or Pekin and resume his employer's business is based on nothing but conjecture. Because there is no concrete evidence as to McCasky's intention, the first part of the re-entry test is not met, and consequently we hold that McCasky had not re-entered his employment at the time of the accident. Our disposition of this issue makes any resolution of the issues involving the impropriety of various jury instructions and the granting of the motion *in limine* to preclude testimony regarding the drinking habits of Santa Fe employees unnecessary.

The plaintiff next contends that regardless of whether McCasky was in the scope of employment, the case should be remanded for a new trial on the issue of damages. The plaintiff alleges that the wrongful death damages of $250,000 were insufficient and contrary to the manifest weight of the evidence.

The following instruction (Illinois Pattern Instructions, Civil, No. 31.04 (2d ed. 1971) was given to the jury and contains the factors to be taken into consideration in determining pecuniary loss:

"In determining pecuniary loss and the weight to be given to the presumption of pecuniary loss you may consider what benefits of pecuniary value, including money, goods, and services the decedent might reasonably have been expected to contribute to the [widow, daughter and son] had the decedent lived, bearing in mind the following factors concerning the decedent:

1. What he customarily contributed in the past;

2. What he earned or what he was likely to have earned in the future;

3. What he spent for customary personal expenses and other deductions;

4. What instruction, moral training, and superintendence of education he might reasonably have been expected to give his children had he lived;

5. His age;

6. His health;

7. His habits of industry, sobriety, and thrift;

8. His occupation."

The plaintiff contends that on the basis of these factors, the pecuniary loss incurred as a result of Arthur Prince's death was at least $513,609. In the case *Keel v. Compton* (1970), 120 Ill. App. 2d 248, 256 N.E.2d 848, this court was asked to order a new trial on the ground that an award given in a wrongful death case was inadequate. There we said: "Many of the criteria relating to pecuniary injury are not susceptible of expression in monetary terms. The weight to be given such factors and their relevance to the pecuniary injury sustained is peculiarly a jury question. Courts are reluctant to disturb jury verdicts in such cases and will not do so unless such verdicts are the result of passion or prejudice or are palpably erroneous." (120 Ill. App. 2d 248, 254, 256 N.E.2d 848, 851.) In *Keel*, we found that the award bore no relationship to the pecuniary injury, and accordingly we reversed and remanded for a new trial. However, in the present case, we find the jury's verdict not to be the result of "passion, prejudice, or * * * palpably erroneous." The only testimony presented at the trial on the issue of pecuniary loss was that of Dr. Robert Resek, and, as the defendant Santa Fe points out, it was the province of the jury to disagree with the doctor's assumptions, or to conclude that the amount of pecuniary loss testified to by the doctor was unsupported by the evidence. The jury obviously did not accept all of Dr. Resek's testimony. We do not feel that the *Keel* test is met here and accordingly we do not think a new trial on the issue of damages is required.

■ The next issue we will consider involves an interpretation of the provisions of section 5(b) of the Workmen's Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.5(b)), which states:

"Where the injury or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under this Act. In such case, however, if the action against such other person is brought by the injured employee or his personal representative and judgment is obtained and paid, or settlement is made with such other person, either with or without suit, then from the amount received by such employee or personal representative there shall be paid to the employer the amount of compensation paid or to be paid by him to such employee or personal representative including amounts paid or to be paid pursuant to paragraph (a) of Section 8 of this Act."

As can be seen from the statute, section 5(b) provides that in

situations where the injury or death of the employee was the result of the tortious act of another, the employer has a lien on the judgment recovered by the employee or personal representative against the tortfeasor in the amount that the employer has paid or is to pay to the injured employee or personal representative pursuant to the Workmen's Compensation Act. The plaintiff contends that because the amount of compensation "paid or to be paid" to the personal representative is incapable of being ascertained, the statute is void. Plaintiff's reasoning is as follows: Prior to July 1, 1975, a ceiling was placed on the recovery that a widow or widower could obtain under the Workmen's Compensation Act for the death of the employee/spouse (Ill. Rev. Stat. 1973, ch. 48, par. 138.7(a)). Consequently, the amount of the lien on the judgment recovered against the tortfeasor was capable of being ascertained. However, in July of 1975, Public Act 79-79, par. 1, removed the ceiling on the award recoverable by the widowed spouse and replaced it with a weekly award payable to the surviving spouse for life. (Ill. Rev. Stat. 1975, ch. 48, par. 138.7(a).) Termination of the weekly award results only when certain statutory contingencies occur. The main thrust of the plaintiff's argument is that since the award "paid or to be paid" by the employer under the Act is at any one moment unknown, the amount of the lien is similarly indefinite, and for this reason section 7 is fatally vague. *Stiska v. City of Chicago* (1950), 405 Ill. 374, 90 N.E.2d 742.

It is true that the sums "to be paid" by the employer to the surviving spouse under section 7(a) are incapable of calculation, but the statute creating the lien does not limit its application to these amounts. Rather, section 5(b) provides that the lien attaches to the judgment in the amount of compensation "paid *or* to be paid." The legislature's use of the disjunctive is all-important, as the amounts "paid" by the employer are always ascertainable. In the instant case, as of the date Electric Mutual's brief was filed (December 5, 1978), Electric Mutual, General Electric's Workmen's Compensation insurance carrier, had paid Marjorie Prince $38,000. As of that date, then, the lien on the judgment was $38,000. Electric Mutual's lien of course accordingly increases $267.01 weekly.

The question next arises as to what portion of the judgment is subject to the lien—one-third of the judgment (that portion to be distributed to Marjorie Prince, executrix of the Prince estate) or the entire judgment, $250,000, as Electric Mutual contends. In support of her position that the lien attaches to only one-third of the judgment plaintiff refers us to the case of *Dillon v. Nathan* (1956), 10 Ill. App. 2d 289, 135 N.E.2d 136. However, *Dillon*, if anything, supports the position of Electric Mutual. In *Dillon* the court interpreted the term "personal representative" as it is used in section 5(b) of the Workmen's Compensation Act:

"The phraseology *'personal representative'* as used in that

subparagraph (b) with respect to suits against third parties, amounts received therein, and workmen's compensation payments received, which the appellants argue means and includes a widow or child of a deceased employee, has, we believe, instead, its ordinary, commonly accepted meaning and connotation, and means simply the administrator, or executor, or party in like official capacity, of a deceased employee, or the conservator or guardian of an incompetent or minor employee, there being nothing in the context or surrounding circumstances to indicate a contrary intention. See: Johnson v. Van Epps, 1884, 110 Ill. 551. Elsewhere in the Workmen's Compensation Act the terminology *'personal representative'* or *'legal representative'* is used in various places in connection with and as clearly distinct from widow, children, beneficiaries, heirs, or next of kin, and as clearly meaning the official representative of a deceased or incompetent or minor employee: Ch. 48, Ill. Rev. Stats., 1953, para. 138.1(b)1, 138.6(b), 138.7(i), 138.9, 138.19(j), 138.23. There is no reason to believe *'personal representative'* as used in par. 138.5 means any thing different from what it means elsewhere in the Act or anything other than, as it usually does, the administrator, executor, or party in like official capacity, of a deceased employee, or the conservator or guardian of an incompetent or minor employee." (10 Ill. App. 2d 289, 297, 135 N.E.2d 136, 140.)

The interpretation to be given the term "personal representative" could not be more clear. In the instant case, the wrongful death action was brought pursuant to section 2 of the Wrongful Death Act (Ill. Rev. Stat. 1975, ch. 70, par. 2), by and in the name of the personal representative of the Prince estate, the executrix, Marjorie Prince. The recovery is also in the name of the personal representative, although it is later distributed (as was the case here) to the surviving spouse and next of kin. The lien of section 5(b) of the Workmen's Compensation Act attaches to the amount received by the personal representative. It is clear from *Dillon* that this means personal representative *qua* personal representative, and not personal representative *qua* surviving spouse. The distribution of the wrongful death recovery by the trial court has no effect upon the amount recovered by the personal representative as a result of the jury's verdict. We hold that the lien of section 5(b) attaches to the entire $250,000 judgment recovered by the executrix, Marjorie Prince, and not to the one-third portion which she herself will recover as surviving spouse.

■■ The final two issues can be easily dispensed with. The plaintiff makes the contention that the trial court improperly severed count III from counts I and II. The statutory provision governing severance of claims is

section 51 of the Civil Practice Act, which states that an action may be severed "as an aid to convenience, whenever it can be done without prejudice to a substantial right." (Ill. Rev. Stat. 1977, ch. 110, par. 51.) In the case of *Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 366 N.E.2d 327, the court, discussing section 51 and section 44 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 44) for the purpose of resolving the issue of whether there was an improper severance of a counterclaim, stated:

> "It is readily apparent drom the foregoing provisions that the trial judge, guided by considerations of convenience and the rights of the litigants, is granted a broad discretion to consolidate and sever claims. The granting of a motion for severance is within the sound discretion of the trial court, and this court will not reverse its determination unless such discretion has been manifestly abused. (*Rogala v. Silva* (1973), 16 Ill. App. 3d 63, 305 N.E.2d 571; *Johnson v. Johnson* (1955), 5 Ill. App. 2d 453, 125 N.E.2d 843)." (51 Ill. App. 3d 350, 355-56, 366 N.E.2d 327, 335.)

The plaintiff claims that she was prejudiced by the severance, but nowhere in her brief does she state how she was prejudiced nor does she point out with any exactitude how the court "manifestly abused" its discretion in ordering the severance. We find the plaintiff's argument that the severance was improper to be spurious.

■■ Equally spurious is the plaintiff's argument that the court erred in allowing McCasky's liability insurer, Country Mutual, to pay the policy limits ($25,000) to the clerk of the court following the verdict in favor of Prince. It is well settled that an appellant can appeal only from those rulings prejudicial to him. (*Gordon v. Gordon* (1955), 6 Ill. 2d 572, 129 N.E.2d 706; *Buehler v. Whalen* (1976), 41 Ill. App. 3d 446, 355 N.E.2d 99.) It is true that the plaintiff has the right to seek full satisfaction of a judgment against joint tortfeasors who are joint and severally liable from any one individual defendant. However, our holding that Santa Fe is not liable under the doctrine of respondent superior results in only one defendant, McCasky, from whom the judgment can be satisfied. Consequently, it is impossible for the plaintiff to be prejudiced by the tender of McCasky's liability insurer. In addition, the record reveals that Country Mutual's activity in this matter has in no way been wrongful. In paying the policy limits to the court Country Mutual was merely discharging its legal obligations as a liability insurer.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Tazewell County against Michael McCasky, but reverse the judgment against the Santa Fe Railway Company and that portion of the order of the court limiting the lien of Electric Mutual to one-third

of the $250,000 judgment, and direct that the lien be applied against the entire judgment.

Judgment affirmed in part and reversed in part.

STENGEL and SCOTT, JJ., concur.